*2:20-cr-00308-JAD-DJA - March 13, 2023*

```
1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF NEVADA

3    UNITED STATES OF AMERICA,      )
                                    ) Case No. 2:20-cr-00308-JAD-DJA
4              Plaintiff,           )
                                    ) Las Vegas, Nevada
5    vs.                            ) March 13, 2023
                                    ) 3:05 p.m. - 5:01 p.m.
6    STEPHEN THOMAS PARSHALL,       ) Courtroom 6C
                                    ) IMPOSITION OF SENTENCE
7              Defendant.           )
     _____ ) CERTIFIED COPY

8

9        REPORTER'S *REDACTED* TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE JENNIFER A. DORSEY
10              UNITED STATES DISTRICT COURT JUDGE

11

12   APPEARANCES:

13   For the Government:  BIANCA R. PUCCI, AUSA
                          UNITED STATES ATTORNEY'S OFFICE
14                        501 Las Vegas Boulevard South, Suite 1100
                          Las Vegas, Nevada 89101
15                        (702) 388-6336

16

17   (Appearances continued on page 2.)

18

19

20

21   Court Reporter:     Amber M. McClane, RPR, CRR, CCR #914
                          United States District Court
22                        333 Las Vegas Boulevard South, Room 1334
                          Las Vegas, Nevada 89101
23                        (702) 384-0429 or AM@nvd.uscourts.gov

24   Proceedings reported by machine shorthand.  Transcript
     produced by computer-aided transcription.
25
```

1   APPEARANCES CONTINUED:

2   For the Defendant:

3       **ROBERT M. DRASKOVICH, ESQ.**
        *ROBERT M. DRASKOVICH, CHTD.*
4       *815 South Casino Center Boulevard*
        *Las Vegas, Nevada 89101*
5       *(702) 474-4222*

6   Also Present:

7       *Erica Strome, USPO*

8                           * * * * *

1      LAS VEGAS, NEVADA; MONDAY, MARCH 13, 2023; 3:05 P.M.

2                          --o0o--

3                   P R O C E E D I N G S

4           **COURTROOM ADMINISTRATOR:**  Now's the time set for an

5    imposition of sentence in Case Number 2:20-cr-308-JAD-DJA,

6    United States of America versus Stephen Thomas Parshall.

7           Counsel, please state your appearances.

8           **MS. PUCCI:**  Good afternoon, Your Honor.  Assistant

9    United States Attorney Bianca Pucci on behalf of the

10   Government.

11          **MR. DRASKOVICH:**  Good afternoon, Your Honor.  Robert

12   Draskovich on behalf of Mr. Parshall who's seated at my right.

13          **THE COURT:**  All right.  Thank you.  Good afternoon.

14          This is the hearing set for the imposition of the

15   sentence on Mr. Parshall in this case.  Back on Halloween he

16   appeared before the Court and entered a plea of guilty to two

17   counts of sexual exploitation of children, one count of

18   coercion and enticement, and one count of receipt and

19   distribution of child pornography.  The plea was entered

20   without the benefit of a plea agreement.  I accept his guilty

21   plea and adjudicated him guilty of these charges.

22          Probation has calculated the offense level under the

23   federal sentencing guidelines to be a 43 and recommends a

24   sentence of 30 years for Counts 1 and 2, 20 years for Count 4,

25   and a life sentence for Count 3, concurrent, for a total term

1    of life in prison.

2            The defense has filed a sentencing memorandum in

3    which it argues for a sentence of 15 years in prison, and the

4    Government has filed a sentencing memo in which it is arguing

5    for a sentence of life in prison.

6            Has everyone had an opportunity to review the

7    Presentence Investigation Report?

8            **MR. DRASKOVICH:**  Yes, Your Honor.

9            **THE COURT:**  And, Mr. Draskovich, have you reviewed it

10   carefully with your client?

11           **MR. DRASKOVICH:**  I have.

12           **THE COURT:**  Are there any unresolved objections at

13   this time?

14           **MR. DRASKOVICH:**  There are not.

15           **THE COURT:**  All right.  Let's go ahead then and work

16   through the guideline calculations, which we find in the PSR

17   beginning on page 13.  Probation used the 2021 guidelines

18   manual incorporating all amendments to determine the

19   defendant's offense level.

20           We start with Count 1, Group 1, sexual exploitation

21   of children for Victim 1.  The guideline base offense level is

22   32.  Probation applied a four-level increase because the

23   offense involved a minor who had not attained the age of 12

24   years.  Then Probation applied a two-level increase because

25   the offense involved the commission of a sexual act or sexual

1  contact.  Probation then applied another two-level increase

2  because the defendant knowingly engaged in distribution.

3  Another two levels were added because the defendant was a

4  parent, relative, or legal guardian of the minor involved in

5  the offense or the minor was otherwise in the custody, care,

6  or supervisory control of the defendant.  Then, in

7  paragraph 70, Probation applied another two-level increase

8  because for the purpose of producing sexually explicit

9  material or for the purpose of transmitting such material, the

10 offense involved the use of a computer or an interactive

11 computer service.  Here it was a cell phone.  So two points

12 were added giving us an adjusted offense level of 44.

13         Do we all agree that is the correct computation on

14 Group 1 -- or Group 1, Count 1?

15         **MS. PUCCI:**  Yes, Your Honor.

16         **MR. DRASKOVICH:**  Yes, Your Honor.

17         **THE COURT:**  Okay.  Group 2, Count 2, sexual

18 exploitation of children, and Count 3, coercion and enticement

19 for Victim 2.  The base offense level is 32.  Probation

20 applied a two-level increase because for the purpose of

21 producing sexually -- sexually explicit material or

22 transmitting such material, the offense involved the use of a

23 computer or an interactive computer service, and that gives us

24 an adjusted offense level for this grouping of 34.

25         Do we agree that's accurate?

1          **MS. PUCCI:**  Yes, Your Honor.

2          **MR. DRASKOVICH:**  Yes, Your Honor.

3          **THE COURT:**  Moving to count Group 3, Count 4, receipt

4    and distribution of child pornography.  The base offense level

5    is 22.  In paragraph 83, two levels were added because the

6    material involved a prepubescent minor or a minor who had not

7    attained the age of 12 years.  And then five levels were added

8    because the defendant distributed in exchange for other

9    valuable consideration but not pecuniary gain this material.

10   In paragraph 85, Probation applied a four-level increase

11   because the -- the offense involved material that portrays

12   sexual abuse or exploitation of an infant or toddler.  And

13   then, in paragraph 86, Probation added five levels because the

14   defendant engaged in a pattern of activity involving the

15   sexual abuse or exploitation of a minor.  In paragraph 87,

16   Probation applied a two-level increase because the offense

17   involved the use of a computer or interactive computer service

18   for the possession, transmission, receipt, or distribution of

19   the material or for accessing with intent to view it.  And

20   then, finally, in paragraph 88, Probation added three

21   points -- or three levels because the offense involved at

22   least 150 images but fewer than 300.  Here it was

23   approximately 120 images and then one video, which equates to

24   75 images, so for a total of 195 images of child pornography.

25   So we increase by four -- oop, sorry -- is this one three or

1    four?

2            **MS. PUCCI:**  I believe it's three levels.

3            **PROBATION OFFICER:**  Three levels.

4            **THE COURT:**  Three levels.  Okay.

5            -- by three levels, and so that gives us an adjusted

6    offense level -- an adjusted offense level for count Group 3,

7    Count 4 of 43.

8            Do we all agree that's accurate?

9            **MS. PUCCI:**  Yes, Your Honor.

10           **MR. DRASKOVICH:**  Yes, Your Honor.

11           **THE COURT:**  And then in paragraph 93 we perform the

12   multiple-count adjustment.  We get two units.  The greater of

13   the adjusted offense levels is 44.  So we increase the offense

14   level under 3D1.4 by two giving us a combined adjusted offense

15   level of 46.

16           Do we agree all of that's accurate?

17           **MS. PUCCI:**  Yes, Your Honor.

18           **MR. DRASKOVICH:**  Yes.

19           **THE COURT:**  And then Probation applied a two-level

20   decrease for acceptance of responsibility.  Do we agree that

21   the factors under 3E1.1(a) are satisfied for that two-level

22   increase -- or two-level decrease?

23           **MS. PUCCI:**  Yes, Your Honor.

24           **MR. DRASKOVICH:**  Yes, we do.

25           **THE COURT:**  All right.  And the Government is not

1    moving for the third point; correct?

2           **MS. PUCCI:**  No, Your Honor.  Thank you.

3           **THE COURT:**  All right.  In paragraph 98 we have the

4    Chapter 4 enhancement.  And so here the applicable offense

5    level is 49, but under Chapter 5, Part A, which tells us that

6    in the rare instances where the total offense level is

7    calculated in excess of 43, the offense level will be treated

8    as a level 43.

9           Do we agree that's correct?

10          **MS. PUCCI:**  Yes, Your Honor.

11          **MR. DRASKOVICH:**  Yes.

12          **THE COURT:**  All right.  So that gives us a level 43.

13          Turning to the criminal history computation, which we

14   find on page 19, the defendant's criminal history score is

15   zero which establishes a criminal history category of I.

16          Do we agree his criminal history category is I?

17          **MS. PUCCI:**  Yes, Your Honor.

18          **MR. DRASKOVICH:**  Yes.

19          **THE COURT:**  I'm flipping to page 32.  For Count 1 and

20   Count 2, the minimum term of imprisonment is 15 years and the

21   maximum term is 30 years.  For Count 4, the minimum term is 5

22   years and the maximum term is 20 years.  For Count 3, the

23   minimum term is 10 years and the maximum term is life.

24          Do we agree those are accurate?

25          **MS. PUCCI:**  Yes, Your Honor.

1          MR. DRASKOVICH:  Yes.

2          THE COURT:  With respect to supervised release for

3    Counts 1 and 2, the Court must impose a term of supervised

4    release of 5 years to life; for Count 3, it's 5 years to life;

5    and the same for Count 4.

6          Do we agree those are accurate?

7          MS. PUCCI:  Yes, Your Honor.

8          MR. DRASKOVICH:  Yes, they are.

9          THE COURT:  The maximum fine for each count is a

10   quarter of a million dollars, and a special assessment of $100

11   per count is mandatory for a total of $400.  The defendant is

12   also subject to the provisions of the Justice for Victims of

13   Trafficking Act of 2015 requiring the Court to assess an

14   amount of $5,000 per count on any non-indigent person or

15   entity convicted of a qualifying offense.  And the defendant

16   is subject to the provisions of the Amy, Vicky, and Andy Child

17   Pornography Victim Assistance Act of 2018.  So in addition to

18   any other criminal penalty, restitution, or special assessment

19   authorized by law, the Court must assess not more than $17,000

20   on any person convicted of a qualifying offense or not more

21   than $35,000 on a person convicted of another -- of any other

22   offense for trafficking in child pornography or not more than

23   $50,000 on any person convicted of a child pornography

24   production offense.

25          And the fine range for this offense is $50,000 to

1    $250,000.

2              Do we agree all of that is accurate?

3         **MS. PUCCI:**  Yes, Your Honor.

4         **MR. DRASKOVICH:**  Yes, it is.

5         **THE COURT:**  I find that Probation's guideline

6    calculations are accurate, and I adopt them.

7              To reiterate, this is level 43, criminal history

8    category I, and Probation is recommending 30 years each for

9    Counts 1 and 2; 20 years on Count 4; life in prison for Count

10   3; all concurrent for a total term of life.

11             And I will now hear argument in support of sentencing

12   starting with the Government.

13        **MS. PUCCI:**  Thank you, Your Honor.

14             Just preliminarily, I do want to let the Court know

15   that I do have Victim 1 and Victim 1's mother here to speak,

16   and I would ask that they speak at the end of the hearing

17   prior to Your Honor imposing sentence.  And I'll do my

18   argument at this time.

19             Over six years' span, the defendant, Stephen

20   Parshall, raped a victim who was starting approximately seven

21   or eight years old until she was 13 years old.  For six years

22   this defendant orally penetrated her, anally penetrated her,

23   and attempted to vaginally penetrate her.  She had to endure

24   that for six years.  At one time throughout those six years

25   she sought help.  She told her mother that the defendant was

1    raping her, and the defendant manipulated the situation.  He

2    convinced the victim that she wasn't being raped.  Rape is

3    only when someone bleeds a lot.  He convinced the victim she

4    was not being raped.  And the mother also did not believe the

5    victim at that point because she -- the victim didn't

6    understand and took it back and she said, I'm sorry, I take it

7    back, I take it back.

8            And the defendant, instead of stopping, he was

9    emboldened.  He was emboldened to continue his rapes of a

10   seven year old, eight year old, nine year old, ten years old,

11   11 years old, 12 years old.  And when the victim was 13 years

12   old, on May 30th of 2020, finally she had reprieve.  The

13   defendant was arrested on other unrelated conduct, and because

14   of that arrest investigators were able to locate images of

15   Victim 1.  They were thumbnail images, but the investigators

16   were not deterred.  They wanted to ensure that the girls that

17   were in the custody and control of this defendant were safe

18   from him.  And in doing so, they brought the girls in, and

19   Victim 1 initially kept her mouth shut.  She had already tried

20   once.  She had tried once to get free of this defendant's

21   rape, and it didn't work.  It was only until the images were

22   shown to her by a third party giving her the opportunity for

23   that freedom, from being raped by this defendant ever again.

24           Your Honor has seen the outcry, that moment where the

25   victim was looking at those images.  You saw her demeanor

1    change.  You saw her able to finally let it out.  She just

2    wanted to be free.  She just wanted it to stop.  She didn't

3    care what happened.  She just wanted it to stop.  She wasn't

4    looking for a crime or punishment.  She just wanted it to

5    stop.  And it has at this point; it has stopped.  And the only

6    way that we can ensure that no other victim will ever fall

7    pray to this defendant is to keep him in custody for life.

8            When the victim was speaking to investigators, she

9    informed them that the defendant would text her, "Come here."

10   As parents use that phrase quite often telling their kids to

11   come here, this defendant, who had custody and control over

12   Victim 1, used those two words for his sexual deviancy.  "Come

13   here" are words that a child doesn't ever shrill from, but

14   those two words resonated differently for Victim 1.  She knew

15   what was about to happen.  She knew what was going to be

16   required of her.  She went; she didn't know what else to do.

17           In the year leading up to the defendant's arrest,

18   there were approximately 29 text messages from him to Victim 1

19   in some variation of "come here."  Approximately 29 times we

20   can attribute in just one year, the last year of his offense.

21   And if you take just each one of those instances in which the

22   victim was sexually assaulted and attribute the mandatory

23   minimum of 15 years, the defendant would be looking over 400

24   years in custody.

25           This case we did not seek that third point, and the

1    reason why we did not seek that third point is because we had

2    to go through intensive trial preparations.  It wasn't until

3    the eve of trial that this defendant ultimately pled guilty.

4    And I don't want to make any mistake, the Court is -- is to

5    consider that plea of guilt, and that's what those two points

6    of reduction are for.  But that third point we are not giving

7    because of the amount of preparation that we had to do in this

8    case.

9         More specifically, the victim had to come in and

10   retell in detail multiple times to prepare.  She was prepared

11   to come in and tell 12 strangers what happened to her.  She

12   was prepared.  She asked multiple times if there was any way

13   that she could do it without having to be in the courtroom in

14   front of him, but due to confrontation issues we explained to

15   her that she was required to be here and she would have to

16   testify in front of the defendant.  She prepared herself.  And

17   then, the minute before -- or the day before that she was to

18   come in and testify, the defendant did plead guilty, but we

19   won't go for that third point.

20        The victim will forever live through the trauma that

21   she's experienced at the defendant's hands.  She will have to

22   deal with this for the rest of her life.  She has gone through

23   therapy and will continue to go through therapy.

24        We are asking for the restitution in this case with

25   regards to the therapy that she's had to undergo and will at

1    least undergo until she's 18 years old.  But that therapy will

2    likely not stop.  She will continue to live her entire life

3    with the trauma that the defendant caused.  He needs to live

4    his entire life remembering that trauma, and that is with a

5    life sentence.

6              In this case there were only three images recovered

7    of the victim, but that doesn't mean that there weren't more.

8    The defendant admitted on his Tumblr chats with another user

9    that he takes picks and vids and he sends them but deletes

10   them.  He's a sophisticated defendant.  He's a sophisticated

11   criminal.  He knows he needs to get rid of the evidence, but

12   he didn't get rid of it all and we were able to find those

13   videos -- or those images and save this victim.

14             In the investigators' attempts to ensure that they

15   had all the information with regards to this defendant's

16   conduct, they went through 17 devices, and on another device

17   they located more chats on what's called Whisper and then

18   moved over to Kik, two social media platforms in which this

19   defendant also victimized other children.  He sought out

20   children in order to create child pornography for his own

21   sexual desires.

22             One of those victims is Victim 2.  She was 16 years

23   old at the time, she was looking for validation, and the

24   defendant gave it to her and he manipulated her.  And then she

25   took pictures of herself to appease the defendant's request,

1    to appease the defendant's sexual desires.  This wasn't a

2    one-off.  The defendant has a clear sexual motive, and in that

3    you can see through his criminal history -- or through the

4    evidence in this case that he has continuously gotten more

5    egregious.

6            Prior to finding -- prior to the defendant finding

7    Victim 2 and victimizing her, he also sought out child

8    pornography images on the Internet, and he traded those images

9    for other images.  He got images as young as an infant being

10   penetrated by an adult penis in that child's vagina.  He sent

11   out prepubescent images to other users.  From child

12   pornography receipt and distribution and trading to coercion

13   and enticement and seeking child -- production of child

14   pornography through the Internet to going hands-on and

15   creating child pornography himself, the defendant has shown

16   that his conduct has escalated over the years, and the only

17   way to protect this society and the children in this society

18   is to sentence the defendant to life.

19           And if at any point for some reason this defendant is

20   able to get out of custody, we are asking for lifetime

21   supervision.  This defendant has demonstrated that even when

22   people try to stop him, seek help, when he's given the

23   opportunity to stop, he won't.  We ask that all the supervised

24   release terms that the Probation Office has put into the PSR

25   are implemented.

1          Additionally, with regards to Condition Number 2, it
2     specifically requests no contact without the Probation
3     Office's approval for his own children.  And as Your Honor's
4     aware under the *United States v. Wolf Child*, specific findings
5     need to be made in order to impose that condition.

6          And in this case, the evidence has shown that the
7     relationship that the defendant had with Victim 1 and the
8     location and how he was able to groom Victim 1 into being able
9     to rape her for all of those years demonstrate that, in order
10    to keep his biological children safe from him, he should not
11    have any contact with them unless previously approved by
12    Probation.  And based on the facts and circumstances in this
13    case, those specific findings can be made to satisfy the *Wolf*
14    *Child* requirements.

15         Your Honor, the defendant is still facing state
16    charges for the hands-on offenses of this victim.  Your Honor
17    was given, prior to sentencing, the transcript of the victim's
18    description of very brutal sexual assaults that the defendant
19    perpetrated upon her.  In reading that transcript,
20    Your Honor's aware that she was able to definitively describe
21    multiple different instances.  And because of those
22    descriptions, she -- the defendant was charged with 23 counts
23    of sexual assault for a child under the age of 14 and 14
24    counts of lewdness with a child under the age of 14 that are
25    still pending in state court.  As this is a related case and

1    because each one of those sexual assaults and lewdness counts

2    are related conduct in the grooming that led to the production

3    and those assaults were at the time that the production

4    occurred, we would ask for that to be concurrent to the state

5    sentence.

6           But the defendant is also pending two matters with

7    regards to the investigation that led to the devices, which

8    I'll just generally refer to as the JTTF investigation.  The

9    sentence we are seeking in this case has nothing to do with

10   those crimes, and as such any sentence imposed here should be

11   consecutive to those two JTTF cases.  There's one in

12   federal court as well as one in state court, and if Your Honor

13   needs those case numbers, I do have those ready.

14          **THE COURT:**  I'll take them.

15          **MS. PUCCI:**  The Federal District of Nevada Case

16   Number is 2:20-cr-128, and the Nevada State Court number is

17   C-20-348860-2.

18          Your Honor, the only sentence that is just in this

19   case is life.  The victim will suffer for life.  She cannot

20   escape a life sentence, and the defendant shouldn't either.

21   We ask that you impose a life sentence.  And if he were ever

22   to get out, a lifetime supervised release with all the

23   conditions.

24          Thank you.

25          **THE COURT:**  Mr. Draskovich.

1          **MR. DRASKOVICH:**  Your Honor, before I -- I address

2     the Court, my client would like to address Your Honor.  Will

3     the Court allow him to make a statement to the Court first?

4          **THE COURT:**  Of course.

5          Mr. Parshall, this is your opportunity to speak to

6     the Court directly.  We call this portion of the hearing

7     allocution, and this is your chance to tell me anything that

8     you think I should consider in deciding what sentence to give

9     you in this case.  Is there anything you would like to say,

10    sir?

11         **THE DEFENDANT:**  Um... I'd like to start off by

12    apologizing to everybody who's here for having to be here.

13         Sorry.

14         I apologize to my family, for everybody who's been

15    hurt in all this.

16         Sorry.

17         I had more.  I just forgot a little bit.  Sorry...

18         I would give anything to go back and make it right,

19    but I can't.  I just... hope that some day... anyone who has

20    been hurt, everyone who's -- who's suffered through this will

21    be able to be okay.  And just know that I'm sorry.

22         That's it.

23         **THE COURT:**  All right.  Thank you, sir.  You can have

24    a seat.

25         Mr. Draskovich.

1          **MR. DRASKOVICH:**  Your Honor, I was retained

2    approximately three years ago.  Mr. Parshall has been in

3    custody now for nearly three years.  You know, it's

4    undisputed, when you review the criminal history, he has a

5    criminal history zero.  He's never been charged or convicted

6    of an offense prior to the allegations that ultimately gave

7    rise to the investigation in this case.

8          You know, throughout the last three years I've had a

9    fair amount of contact with Mr. Parshall -- Mr. Parshall and

10   his family which is seated here behind me.  As Your Honor's

11   well aware from reviewing the Presentence Investigation

12   Report, he has a very large family.  In fact, his mother and

13   his father and six sisters would like to briefly address the

14   Court as well.

15         What's been very curious and somewhat out of the

16   ordinary through my representation of him is that he's had no

17   contact with his family up until just recently with his

18   mother.  They've complained that they send him letters, and

19   they don't hear back.  They contact my office and ask me to

20   drive out and check on him because they've heard nothing from

21   him.  He's truly remorseful for what this case has done to his

22   family, and I'm referring to both sides of this courtroom.

23         You know, I believe it was very telling -- and his

24   statement was not prepared by me.  I went and visited him a

25   week and a half ago.  We didn't go over what he should say or

1    what he shouldn't say.  He didn't ask Your Honor for leniency.

2    He figured he's 38 years old.  His life, for all intents and

3    purposes, is maybe over.

4           What concerns me -- and this happens in every case

5    that -- where a defendant enters a plea.  You know, the

6    competing narratives of what may or may not happened merge in

7    one, and then it's, well, we're going to have this

8    demonization of a person through all aspects of their life.

9    They now become a sophisticated criminal.  They become

10   violent.  I mean, that's an understandable tendency, but

11   oftentimes circumstances which give rise to cases such as

12   these are not like that.  The circumstances are more complex.

13          I'm not in any way making light of what occurred, and

14   that's why Congress seemed fit to impose such harsh sentences

15   both in the federal prosecutions as well as state

16   prosecutions.  But the question really becomes:  What sentence

17   is sufficient and not greater than necessary to, you know,

18   address the elements laid out in 18 USC § 3553?  There's no

19   question concerning the seriousness of the offense.  The

20   question becomes:  What is just punishment?

21          Obviously any sentence -- and there's mandatory

22   minimums -- will afford adequate deterrence; although, most of

23   these cases are committed by first-time offenders.  I mean,

24   the level -- the level of recidivism is fairly small for those

25   that are convicted of a sex offense.  (c), to protect the

1    public and ultimately, (d), to provide defendant with needed

2    education or vocational training.

3            You know, as Your Honor saw in the Presentence

4    Investigation Report, Mr. Parshall comes from a very religious

5    family.  His family are -- are members of the Church of Jesus

6    Christ of Latter-day Saints.  And then the question then

7    really becomes the very basic tenants of Christians, you know,

8    that -- an idea of hope, redemption.  You know, to argue that

9    a life -- a sentence of life is the only way to adequately

10   protect him from committing offenses in the future I think is

11   based on speculation because he hasn't been through the

12   criminal justice system before.  He's never been incarcerated

13   before.  The last three years that he sent -- spent in a

14   high-security detention facility is the first time that he's

15   ever experienced anything like that.

16           As Your Honor has seen from the Presentence

17   Investigation Report and our -- and our sentencing memorandum,

18   he served our country honorably between 2007 and 2011.  He was

19   deployed to the Persian Gulf.  He obtained the rank of a

20   Seaman E-3.

21           You know, human beings, we're very complex animals.

22   We've evolved to be very complex.  We're a combination of

23   aggressive, passive, cooperative, competitive, mean, nice -- I

24   mean, people aren't one thing.  I mean, the human species is

25   not binary.  We're not good; we're not bad.  We're very

1   complex animals with a wide range of attributes and

2   characteristics.

3            I actually liked him, and I know that has nothing to

4   do with the Court's decision of appropriate sentence.  He's

5   pleasant.  He's intelligent.  He's got some very good

6   attributes.  And to just say, well, he's only deserving of a

7   life sentence I think is really not the appropriate sentence.

8   I've had dealings with our -- with the Government, with this

9   specific prosecutor.  She's very well-intentioned.  I mean,

10  the State and the Government -- in this case, the Federal

11  Government -- generally tried to do the right thing, and I

12  hold a great deal of respect for them and the job they do.

13           Sometimes very well-intentioned individuals create

14  certain expectations upon those who have been victimized that

15  are concerning, and I know this from firsthand experience from

16  a member of my family.  To tell a person you are going to be

17  traumatized for the rest of your life, you will suffer for the

18  rest of your life, you'll be a victim for the rest of your

19  life creates conditions that aren't necessarily beneficial to

20  that person that's been a victim of a crime.

21           You know, I'm not going to stand here -- and we've

22  addressed it in the memos, both sides, what we believe the

23  appropriate sentence is.  I wouldn't presume to know what

24  Your Honor should do and what Your Honor should sentence this

25  gentleman to, but I would submit with the idea of hope for all

1    parties involved and for this idea of redemption.  To really

2    lock him up without any possibility of a release is not

3    appropriate.  If he was this second, third, fourth-time

4    recidivist who has appeared before Your Honor or any other

5    judge, for that matter, who just can't keep from committing

6    crimes such as these, I would submit that that would be the

7    appropriate sentence.  But given that we are dealing with a

8    human being who is not a sophisticated criminal, who made some

9    attempt to get rid of evidence which never occurred, and we

10   are left with these three images of this alleged victim or

11   this victim and we should somehow assume that there's more I

12   think is well-intentioned but not appropriate.

13        I would urge the Court to consider a sentence that

14   would allow him to be released and to have him -- something to

15   work towards.  You know, sentencing him to life without

16   doesn't really restore anything to anybody.  It's a tragedy

17   any way that you look at it, whether your name's in the

18   caption or it's a pair of initials as the victim.

19        He has two natural daughters that love him dearly.

20   I'm not going to stand and argue before Your Honor that a

21   period of supervision for life would not be appropriate.  They

22   need a father as well.  He needs to have some communication

23   with them by writing, by supervised video contact.  Because

24   precluding them from their father, physically or otherwise,

25   again, is -- is not in their best interest and will cause harm

1    to them.

2          Based upon these factors, those contained within 3553

3    and those contained within our sentencing memorandum, I would

4    urge the Court to impose a sentence less than that argued for

5    by the Government, and on that I'd submit it.

6          **THE COURT:**  Thank you, Mr. Draskovich.

7          Ms. Pucci, is your preference that I hear from the

8    victim and her mother before I hear from Mr. Parshall's

9    supporters or after?

10         **MS. PUCCI:**  May I have a moment, Your Honor, just to

11   kind of --

12         **THE COURT:**  You may.

13         **MS. PUCCI:**  If the defense would like to have their

14   statements first, the victims in this case will go last.

15   Thank you, Your Honor.

16         **THE COURT:**  All right.  Mr. Draskovich, you indicated

17   you had brief statements by family members?

18         **MR. DRASKOVICH:**  Yes, Your Honor.  We -- if we could

19   start with his mother and then his father.

20         **THE COURT:**  Okay.  And there's a microphone right

21   there in the gallery.

22         **MR. DRASKOVICH:**  He has six siblings.  Are we

23   still -- do we want six sisters to speak?  There's --

24         **MRS. PARSHALL:**  Not everybody's speaking.  Not

25   everyone's speaking.  We've wrote it out.

1          **MR. DRASKOVICH:**  We'll start with mom with the

2   Court's permission.

3          **THE COURT:**  Thank you.

4          And your name for the record?

5          **MRS. PARSHALL:**  Deborah Parshall.

6          **THE COURT:**  Thank you.

7          What would you like to share?

8          **MRS. PARSHALL:**  Can I start out by saying that if I

9   listen to what was said and did not know this person, I would

10  only see a monster in my mind.  If it's okay with you, we'd

11  like to maybe put a few pieces in the puzzle here that paint a

12  little bit of a different picture of what Stephen has been

13  during his life.  And whether it helps you or not understand

14  him better, we also want him to know, remember what we feel

15  about him.  Nobody has anything long to say, so thank you.

16         You probably don't know this, but Stephen did not

17  want any of us here today.  He has been trying to spare us any

18  hurt that we've already felt, experienced, and this is his way

19  of protecting us.  That's one of his ways that he shows his

20  love, is to protect us.  But we are a family, and we come

21  together to help each other.  That's how we show our love.

22         As you know, Stephen was born Number 6 in a family of

23  12.  He's the second son of only two boys.  His only brother,

24  Chris, is ten years older, but from the day Stephen was born,

25  there's been a bond between those two brothers unlike anything

1    I've ever witnessed.  Chris thought Stephen was a gift just

2    for him, and Stephen absolutely adored his brother.

3            When Stephen was 14 years old, Chris was killed in an

4    automobile accident.  Naturally, the entire family was

5    devastated, but none more so than Stephen.  He hardly talked

6    or ate for days.  To be honest, we were all in a world -- lost

7    in a world that hurt and did not know how to handle it.  I

8    only bring this up because of what Stephen did with this, not

9    the idea that his brother died.  It was Stephen who

10   inadvertently figured out how to help the family recover from

11   this tragedy.

12           There was a boy named Daren around Stephen's age

13   staying with someone down the street.  Daren had been taken

14   out of his home by Child Protective Services.  Stephen came

15   home one day and asked if we could take Daren in and let him

16   be part of our family.  I was -- honestly, I was stunned.  I

17   couldn't even hardly take care of my children at the time,

18   still dealing with the feelings of losing a child, but Stephen

19   kept insisting we need to help Daren, we need to help Daren.

20   And we did.  That is how Stephen ended up having a foster

21   brother, Daren, for many years.

22           As we helped Daren with his problems, we forgot our

23   own.  Stephen understood this naturally.  That is natural for

24   him to reach out to help people.  That is how we have seen him

25   his whole life.  I -- Stephen has spent most of his life

 1    helping others.  And I just want to say, I know that sounds

 2    trite, but it would be impossible to fill you in on the whole

 3    of Stephen but each of us will add a piece to this so maybe

 4    you can get an idea.

 5         As long as I am alive, I will support my son in any

 6    good he is willing to do or any changes he makes to better

 7    himself.  But it will make no difference in the love that I

 8    have for him; that is freely given.  I believe him to be a

 9    good man.  We are not defined by the one action but by the

10    many.

11         Thank you.

12         **THE COURT:**  Thank you.

13         Hi there.  Tell me your name.  And you can point that

14    microphone up, too.

15         **MR. PARSHALL:**  Good afternoon, Your Honor.  My name

16    is Bruce Parshall.  I am Stephen's father.

17         I have known him his entire life.  He was and is

18    still and will always be the greatest Father's Day present I

19    had ever received.

20         From his earliest childhood he was always the

21    champion of those people who were in need.  I remember one

22    evening when our family was coming out of a restaurant and an

23    automobile accident occurred at that moment.  Without

24    hesitation, Stephen immediately made his way across six lanes

25    of traffic to be the first one there to help.  He doesn't

1   think of the other people -- or of himself, he only thinks of

2   the other people to help.  He doesn't question whether or not

3   he should help.  He only questions how fast he can get there

4   to help.

5          Years later, while serving in the Navy, he

6   volunteered to assist in the rescue and recovery effort of

7   the -- after the Fukushima nuclear power plant disaster that

8   occurred after that earthquake and tsunami hit Northern Japan.

9          He's always been the one to show up to help, whatever

10  the need, and he usually works the hardest.  When family

11  members or friends move, he's the one that can be counted on

12  to be there to help.  When anyone who knows him needs help,

13  he's the one to call.  When I have a project that I need help,

14  my son is the one to whom I turn.

15         He's always been the dad that I wanted to be.  He's

16  spent his weekends taking his girls to parks, on frequent

17  camping trips, hikes to interesting places, road trips to

18  scenic places.  He wanted them to appreciate the scenic beauty

19  of the world around us.  Every year he would take his kids out

20  to the Fourth of July activities in Boulder City.  He also

21  taught them why we celebrate the Fourth of July; that it

22  wasn't just a day of picnics and parades, but there was a

23  significance to that date and to respect and remember the

24  history of the country.

25         He instituted family institutions like doughnut

1    Fridays for his daughters to give them something to look

2    forward to after a hard week at school and to celebrate little

3    things in life as well as the big ones.

4          He's a loving and devoted father.  He's a caring and

5    a protective brother.  He's a fun and respected

6    brother-in-law.  He's a well-loved and beautiful son.  He's an

7    Eagle Scout, and he is a veteran.  People who know him love

8    him and respect him.

9          The fact that he has pled guilty to a crime is

10   further unwillingness -- further evidence of his unwillingness

11   to cause harm to others.  He would rather suffer these

12   consequences than drag his children through a public

13   spectacle.  If possible, I would have the Court reject that

14   and take it to trial, but I've been told that that's not

15   possible.

16         I love my son.  And it's possible that it might

17   appear that I have every reason to paint life as -- to paint

18   him as -- as an angel who has done no wrong.  All I wanted was

19   to let you know that there is much more to his character than

20   what he's been accused of and that there are reasons why he

21   may have made the pleading that he did.

22         I appreciate your time.  Thank you.

23         **THE COURT:**  Thank you, sir.

24         Who's next?

25         Hi there.  Tell me your name.

1          **MS. DAVIS:**  Hi.  My name is Nicole Davis.

2          Stephen is my younger brother.  I've always

3     considered myself luckily to have him as such.  Stephen is a

4     good person who came from a good home.  As you can see, he has

5     ten sisters but only one older brother who you had learned

6     that has died when Stephen was only about 15.

7          As his sister, he has always been respectful, loving,

8     considerate towards me and my family.

9          Growing up, Stephen was special.  Not because he was

10    a brother in a house full of girls, but because of his

11    personality.  He was so energetic and fun-loving that we loved

12    being around him.  Just as his lawyer has said, he -- you

13    can't help but just love him.

14          This was a -- sorry.  He felt like he was always in

15    trouble or disappointing people because he didn't fit the

16    criteria that anyone had set for him.  This was right at the

17    height of learning about ADHD as a newfound diagnosis and

18    trying to fully understand and diagnose it in Stephen.  It was

19    heartbreaking to watch as Stephen would just feel broken.  His

20    intentions were never to hurt or offend.  Stephen then started

21    accepting blame or sacrificing himself if it meant it would

22    help someone else or kept them from feeling sad or hurt.  He

23    knew what it felt like to be dejected, sad, or hurt, and

24    didn't want anyone else to feel like that if he could help it.

25          If he ever saw anyone that looked upset or in need,

1   he was the first to try and uplift and help in any way.  These

2   experiences seemed to make him more considerate and

3   compassionate.  He seemed to always find the stray and social

4   rejects when it came to friends.  He wanted so badly to be

5   able to help them see their worth and their value.  This trait

6   does not only impact people around Stephen but to animals as

7   well.  I don't even know how many times he brought a stray

8   animal to our parents' homes or even to my home.  He

9   absolutely loves animals and treats them with tenderness.

10          When my husband and I purchased our first dog from

11  the pound, Stephen found out that our dog had had a sister

12  that we were able -- unable to adopt.  He could not bear the

13  idea that this dog was left without her sister, so he went to

14  the pound the very next day to bring her home.  He regularly

15  brought his dog over to my house to let the sisters play.  The

16  excitement they shared in seeing each other was matched by

17  Stephen's own excitement.  He always looked out for the strays

18  and the rejected wherever he was.

19          Stephen is my younger brother, but I've always looked

20  up to him.  His love for family and his desire to do and be

21  good is commendable.  I love watching him play with my

22  children.  He is absolutely the cool uncle.  Being such a kid

23  at heart, Stephen was the one who would play, tease, and give

24  my children the attention that all kids require.  I loved when

25  I would have another baby and to be able to share one with him

1    because he loves them so much, especially when they became

2    more interactive and attentive.  I did have to keep an eye on

3    him because he would try to give them their first bite of ice

4    cream or candy before they even cut their first tooth.

5         I recently had the opportunity to be able to

6    videoconference with Stephen and introduce my youngest child

7    to him who is now a year and a half.  I was so excited to

8    share that with him, but the experience was hard at the same

9    time.  Stephen's incarceration has been hard on our family,

10   particularly because we know how hard it is for Stephen.  He

11   loves his family deeply, and knowing that he is missing out

12   and may have hurt us is probably the worst form of punishment

13   for him.

14        I was surprised to hear any of the accusations said

15   about him because it does not align with his character.  But

16   it does not change how I feel about him or make me think less

17   of him.  Stephen has always been willing to take

18   responsibility for his actions.  I know him to be an honorable

19   individual and truly one of the good guys.  We love him, and

20   we want the best for him.

21        Thank you.

22        **THE COURT:**  Thank you.

23        Hi.  Tell me your name.

24        **MS. PARSHALL:**  My name is Emily Parshall.

25        I am writing a character statement on behalf of my

1    older brother, Stephen.  As he's almost nine years my senior,

2    I have known Stephen my whole life.  I am the second youngest

3    in our family of 12.  We're --

4        *(Reporter instruction.)*

5            **THE COURT:**  She's asking for you to slow down.  It's

6    hard for her to write what you're saying.

7            **MS. PARSHALL:**  I do have it written down because I

8    will speed up again.  So just remind me.  I will slow down.

9            **THE COURT:**  I think I even have a sign up here.

10            **MS. PARSHALL:**  Perfect.  I will try to look up.

11            We're divided rather unevenly with ten girls and two

12    boys.  But since I was barely six when my oldest brother,

13    Chris, died in a car accident, for most of my remembered

14    childhood there was only Stephen.

15            Most of my best memories from childhood included

16    Stephen.  We lived across the street from our elementary

17    school and just down the street from the junior high.  Though

18    it wasn't necessary with our proximity to the school, Stephen

19    would insist on picking me up from kindergarten on his

20    skateboard so I could ride home with my cool older brother.

21    Sometimes he even stopped by the ice cream truck around the

22    corner and let me get a Tweety Bird Popsicle.  Since the eyes

23    were gumballs, that was a rare treat we were never allowed

24    from our parents because, with our long hair, we often had

25    gum-related incidents.

1    Stephen taught me how to ride a bicycle, climb trees,

2    play trampoline dodgeball, and the floor is lava on the school

3    playground equipment.  When I was practicing math sheets, in

4    order to be the fastest in my third grade class for a

5    competition, Stephen sat and timed me over and over.

6    In middle school, Stephen bought the Disney video

7    game Kingdom Hearts.  The four youngest girls, which included

8    me, loved to watch him play since he was better at it than us.

9    It was like watching a movie.  When he got to the end of a

10   game and it was time for him to battle the big boss, he waited

11   until all of us got home from school and then ran downstairs

12   to tell us he had been waiting all day for us.  Stephen --

13   dang it.  Stephen didn't need our presence to play the game,

14   but he knew how badly we wanted to watch it so he used a well

15   of patience not often found in teenage boys to wait for us to

16   return home from school.

17   At one point Stephen also started to learn how to

18   draw.  He recorded cartoon television shows and paused them in

19   order to draw a scene or a character.  When I wanted to sit

20   and try to draw with him, despite having no artistic ability,

21   Stephen gave me tips and waited for me to finish my own

22   drawing before moving the cartoon show forward.

23   By the time I was in high school, Stephen had chosen

24   to enter the Navy.  Before he left for boot camp, he gave all

25   of us his address and asked if we would write him.  I remember

1   writing him and thinking I wouldn't hear back.  We have a

2   significant age gap and there are other sisters who are much

3   closer to him so I didn't expect or need a letter in response

4   and said so in my letter.  Not only did I get a letter back,

5   but he also promised that he would always respond to any

6   letter I wrote him.  For the next few years that he was in the

7   Navy, that proved true.  No matter how long it was between

8   letters or how far away he was, I always got a letter back

9   when I wrote one to him.

10          After college, I served a mission trip for my church

11  for 18 months.  When I returned home, my whole family was at

12  the airport to greet me, along with Stephen's new beautiful

13  baby girl.  I have never seen a prouder father, and I have six

14  brothers-in-law.

15          A short time later, I was renting my first apartment

16  with my younger sister.  There had been a lot of moving within

17  my family.  With siblings buying houses and relocating in and

18  out of the state, we had the whole packing-and-moving thing

19  down pat.  But when I let everyone know the day we were moving

20  into our fourth-floor apartment with no elevator, Stephen was

21  the only who showed up to help.  He had his kids that day, but

22  just brought them and put them to work inside the apartment

23  doing little things that made them so excited to help.

24          When we purchased a home a year later, Stephen was

25  there again to help.  He is always there.  Service and family

1   are and always have been key tenets of Stephen's personality

2   and character.  There has never been a time when I have

3   hesitated to call and ask for help nor doubted it would come

4   when I did.

5        Stephen has always exemplified serving and helping

6   from his sisters to his friends to the Navy to his own

7   children.  Nobody has ever -- dang it.  Nobody who has ever

8   watched him interact with his children and family would ever

9   doubt the selfless love he has for them.

10        These charges and his plea were very hard to hear and

11   even harder to accept, but there was no point during this

12   process, whether innocent or guilty, that Stephen has not had

13   my love and support.  I believe actions need to have

14   consequences.  I believe in the law and in justice, and I also

15   believe in mercy and compassion.  My hope is that this further

16   understanding of who Stephen is will help with the incredibly

17   difficult task of balancing the two.

18        **THE COURT:**  Thank you.

19        **MS. BOWMAN:**  My name's Camilla Bowman.  Sorry.

20        I will also be brief.  Thank you for your time.

21        Stephen Parshall is my older brother.  I've known him

22   my whole life, which is 35 years, and I just want to describe

23   a few aspects of his character to help all parties receive the

24   most accurate portrayal of the kind of person that he is.

25        He has several core beliefs.  He serves others.  He

1    loves his family, and he protects his family.  He provides

2    service to everyone.

3         When he completed boot camp training for the Navy, he

4    participated in a naval graduation ceremony after which he

5    disappeared for a little while.  We discovered later that he

6    was helping other Navy graduates carry their luggage to their

7    cars.  He never misses an opportunity to help a person.

8         When Stephen married and assumed the role of father

9    for the first time, he realized quickly that structure was

10   needed for his daughters, and he began to institute a regular

11   bedtime and a regular routine of family dinners and homework

12   time, even though it made him the bad guy at times to enforce

13   new rules that his girls may not have enjoyed.  He loved them

14   enough to hold firm to these regular practices, and gradually

15   his daughters began to thrive under a steady, consistent,

16   two-parent household.

17        Stephen is more concerned for the welfare of his

18   daughters in particular, but also for his sisters and his

19   parents, than he is for himself.  In his attempts to shield

20   everyone from hurt or harm, he is willing to sacrifice the

21   remainder of his life.  But I know with certainty Stephen has

22   more value, love, and worth to offer the world outside of

23   incarceration.

24        Thank you.

25        **THE COURT:**  Thank you.

1          **MS. SPAHR:**  Hi.  My name is Heather Spahr.

2          Stephen is my closest sibling in age, and as such, we

3     spent a lot of our time together.  I understand Stephen has

4     pled guilty, and I'm writing to offer a more complete picture

5     of who he is as a person.

6          Stephen is considerate, thoughtful, compassionate,

7     entertaining, and accepting.  I often recall the many years we

8     spent playing outside constructing our own alternative reality

9     of make-believe.  He was the best at thinking up creative

10    solutions to boredom, and exerted enormous effort to make each

11    of his ten sisters laugh if any were in need.  I think of

12    those years with fondness, affection, and emotion.

13         He is, by definition, my younger brother, but he has

14    often taken upon himself the role of protective older brother

15    by choice.

16         Out of respect for the Court's time, I will focus my

17    remarks on one facet of Stephen's character that stands out to

18    me.  His steady and consistent ability and desire to accept

19    full responsibility for his choices.  I can easily remember

20    times as children when our make-believe world would

21    occasionally result in the accidental breakage of a lamp or

22    household item.  Playing tag with eight children indoors can

23    sometimes get a little rambunctious.  In a large family, it's

24    easy to point the finger at another sibling and escape

25    punishment.  However, any time Stephen was the one at fault,

1    he was more likely to own up to his mistake and accept the

2    punishment.  Sometimes he would even take the punishment when

3    he wasn't at fault because he thought it would spare his

4    sisters from a grounding or extra chores.

5         He was and is a very caring and considerate person.

6    His desire to protect others has often resulted in the

7    detriment of his own freedom.  This is so consistent with

8    Stephen's proclivity to think about others more than himself.

9    Stephen has demonstrated this character strength his entire

10   life.  It is part of who is he.

11        I struggle to put into words all that Stephen stands

12   for because he is so much more than the one example I offered.

13   I've always known I could rely on Stephen.  He is the favorite

14   uncle, beloved brother, dependable father, and a hardworking,

15   contributing member of society.

16        Thank you for taking the time to read my testimony as

17   I hope it will help you understand a little more the depth of

18   Stephen's character.  I am and always will be available to

19   support Stephen in whatever he needs.  I love him because I

20   know who he is and what he stands for as a person.

21        As Paul "Bear" Bryant said, when you make a mistake,

22   there are only three things you should ever do about it:

23   Admit it, learn from it, and don't repeat it.

24        I've seen Stephen put those wise words into action

25   and look forward to his continual growth.

1          **THE COURT:**  Thank you.  Anybody else?

2          **MS. PARSHALL:**  Hi.  I'm deaf.  So if you're having a

3     hard time [indiscernible] me, let me know please.

4          Okay.  I'm Stephanie Parshall.  I am Stephen's oldest

5     sister.  Bear with me.  I'd like to share what I know about my

6     brother Stephen.  I'm sorry.  All right.

7          I'm sorry.

8          **THE COURT:**  If you would like, maybe someone else can

9     read your letter for you?

10         **MS. PARSHALL:**  Sure.  I'll have my mom read it for

11    you.

12         **MRS. PARSHALL:**  She told me no.

13         She says:  I'd like to share what I know about my

14    brother, Stephen.  Stephen loves his family.  I mean, fiercely

15    loves his family.  He loves doing things with his family.  One

16    way he demonstrated this love is by taking his family each

17    year to the Boulder City Fourth of July Parade for the water

18    activities.  His girls loved attending, and Stephen had so

19    much fun that he encouraged his sisters and his sisters'

20    families to attend as well.  It has become an annual tradition

21    thanks to Stephen's love of wholesome recreational activities

22    with his daughters.  Stephen would do anything for his family.

23    I know he -- sorry -- I know he loves his family as much as I

24    love him.

25         Thank you for your time.

1          **THE COURT:**  Thank you.

2          Is that everybody?  Okay.

3      **MR. DRASKOVICH:**  Yes.

4      **THE COURT:**  All right.  Thank you.

5      Ms. Pucci.

6      **MS. PUCCI:**  Thank you, Your Honor.  The Victim 1's

7  mother would like to speak first.

8          **THE COURT:**  Yes.

9      **MS. O'MALLEY:**  Hi.  My name's Veronica O'Malley.  I'm

10  ██████' mom.

11      **THE COURT:**  And that -- can you raise the podium for

12  her a little bit, too?  I think maybe the...

13      **MS. O'MALLEY:**  Thank you.

14      **THE COURT:**  Thank you.

15      **MS. O'MALLEY:**  I've waited for this day for some time

16  because I didn't talk to anybody about what had happened.  I

17  didn't tell his parents the pain that I went through before we

18  were even to the point of being found out.

19          His family is lovely.  They're amazing.  His sisters

20  have supported me through very, very dark times, but not after

21  this particular incident.  On June 1st of 2020, my family's

22  home was raided by the FBI.  It was dark.  It was early in the

23  morning.  I had to walk out of my home with my hands in the

24  air.  Once they saw I wasn't armed, my four daughters had to

25  do the same.  My second daughter, she had to run to the

1    bathroom and throw up because she was so scared.  My dad was

2    next to come out with our dogs.  My family sat in the back of

3    my father's truck for hours.  My dogs were separated and in

4    two different vehicles.  The search took a long time, and it

5    did because my home was a disaster.  It wasn't fit for anybody

6    to live in.

7          They were looking for evidence for what he was

8    originally arrested for.  This event is what led to the dark

9    secret and why we are here.

10         While we were waiting, my two younger girls were able

11   to just fall asleep in the back of this pickup.  We were

12   outside.  They offered us shelter in their vehicles, but my

13   kids wanted to be by their mom.  ████ really didn't have any

14   emotion to this event, and I really didn't understand why.  I

15   thought she was in shock.  My second daughter was definitely

16   in shock.

17         In the morning, after they were done searching, I

18   signed papers on everything they took.  We all went into the

19   house to sleep because we were physically, mentally, and

20   emotionally exhausted.  I got up and informed his parents and

21   went back home.  Informing his parents of the situation was

22   very hard.  They were good people, and telling them that their

23   son was arrested and being charged for domestic terrorism was

24   very difficult because I didn't understand any of it.  I did

25   not -- I am not a political person when it comes to going out

1   and doing things.  I have my opinions.  And what I can do to

2   exercise them, I exercise them myself.  I don't try to impose

3   myself in places.

4          A friend of mine came over to sit with us and tried

5   to make things seem normal.  That's when the police and the

6   CPS showed up.

7          I'm sorry.  Everything's all over the place.

8          And they asked me to sign my girls over to someone

9   and to make my home liveable, and I did.  I signed my girls

10  over to his mother.  I started that day with my dad and a few

11  friends.  All of his sisters came and helped.  His

12  brother-in-laws came to help.  My dad worked so hard, he got

13  heatstroke.  We rebuilt my home from the floor up.  I had ten

14  days to do this.

15         During this time, I saw a shift in the personnel that

16  was helping with my case.  My home got to the condition for a

17  series of reasons that we were -- became unliveable.  I worked

18  full time.  There was a period of time that I worked part time

19  but it was at night, and I came to find out later that at

20  night was sometimes when he would go after my daughter.  There

21  was no opportunities for me to come home early and catch him.

22  I didn't know because he always had my car.

23         I went back to work full time, and I worked full time

24  most of our relationship.  He rarely worked, and if he did, it

25  was his money.  I went back to full time to be able to pay my

1    bills because he was stealing the money and gambling it.  And

2    what we would tell me to make a life for us, maybe if he won,

3    he could get something for us.

4         I cooked all the meals.  If he fed them, it was

5    something very simple like rice with cream of mushroom soup.

6    My daughter, to this day, still hates cream of mushroom soup

7    because it reminds her of him.

8         On my days off, I would try to clean, but he would

9    guilt me into believing that I was a slave driver to my

10   children and I wanted everything perfect and that they would

11   only love me and everybody would only be happy if we went out

12   and we did things.  My kids did enjoy these activities, but

13   they were always coming home to a dirty, disgusting house, and

14   I never got help.

15        If we did clean the house, it would turn into a

16   fight.  He'd be screaming at the girls at the top of your

17   lungs so much that the only way to stop the fighting was to

18   stop and go do something.  And he would showcase all of the

19   things that he did with the girls; taking them to the park,

20   taking them on these trips, take them and teach them Nevada

21   history.  Those are all things that his father taught him and

22   did with him.  But when we came home, it was gross.  It was

23   disgusting.

24        So other excuses for the house not being clean was --

25   some of them, were you have kids.  It's going to be messy.  My

1    brother-in-laws don't even clean; my sisters do.  And my

2    expectations were too high.  This still affects me to this

3    day.  When too many things are out of place in my home or I

4    [indiscernible] small, I start to panic and I start to clean

5    my house.  I start to think about the filth I was in.  When

6    Saturday morning comes and I start to clean the common areas,

7    I have to remind myself I don't need to rebuild this like I

8    have had to before.  All I need to do is just maintain it and

9    clean it.

10        It was during that time that they had seized all of

11   these items.  Their family doesn't speak to me any more and

12   has alienated ███ and her sister from them, her sister being

13   the second oldest.  They can't get past the denial of their

14   grieving that these things actually happened to ███.  At one

15   point, somebody had told me that they thought they had paid

16   off my daughter to say these things, and my daughter heard

17   that.  So she believes that nobody in the family believes that

18   these things had happened to her and that she is a liar, and

19   she is not.

20        I never told them what kind of monster he was and how

21   he was just mean to me and the girls.  They only saw the show

22   that you consistently put on them -- for them.  You would

23   always put on show for anyone you had to, and you could change

24   your character into what would be approved of in the situation

25   that you were in.

1    Your mother still helps me with the two younger

2 girls.  You dad won't even look at me.  And any conversation

3 that does happen always is awkward.  And I believe that they

4 start to realize that their son did do these horrible things

5 to me and to my daughters.  And we are doing great, but those

6 memories of this time that we lived in that house will never

7 go away.  And they're not going to go away in 15 years, and

8 that's what they're asking for, is only 15 years for him.

9 Those memories will never go away for my children.  Somebody

10 raises their voice in the house, you can see my kids duck and

11 get scared.

12    One of the times that he convinced me he was somebody

13 else was I did find something in his phone that wasn't

14 appropriate.  It did have children in it.  And when I brought

15 it to his attention, he tried to explain to me how he was

16 using them to catch people who were pedophiles like a

17 vigilante.  I was so stressed out in my own home that I

18 couldn't see anything except for what was right in front of

19 me, and I lived like that every day for -- we were together

20 for eight years -- for at least five.

21    On the day all my daughters had to go through their

22 interviews with CPS, I had to change my hair color because I

23 was receiving threats in your involvement with the boogaloo

24 boys.

25    ███ was first up, and we finally had the opportunity

1    to be set free.  All the details of her case and what she told

2    them I let her keep.  That is her story.  I never pushed to

3    have details.  I don't need them.  I believe my daughter.  I

4    know he did these things to her, and I believe he would do

5    them again.  And they would have not stopped if my house

6    wasn't raided that evening.

7          Hours later, I get the news, because I was sitting in

8    the CPS office with my other three daughters and his mother.

9    They had moved his mother out of the area and came in, and

10   that's when they told me.  They had pulled me in a room, and

11   they had showed me photos.  I didn't want to see these photos,

12   but I had to.  I feel now, if I had saw them, I could identify

13   more, but I was in such shock that something had happened to

14   my daughter and I didn't listen to her the first time.  When

15   she had came to me the first time, she had used the word rape.

16   And when I had asked her questions on what had happened,

17   her -- her answers were very pulled back.  They were like,

18   well, I don't like how he walks around in his underwear.  I

19   don't like it when he cuddles me.  And she was eight, and I

20   don't know if she understood or wanted to tell me the

21   questions.  But she was telling the truth; he was raping her.

22   And she decided that she was just going to keep that to her

23   and protect herself -- not herself -- protect me and her

24   sisters.

25          Her name is ███, which is the protector of the

1    underworld, guardian of the underworld, and she did.  She

2    protected everybody on how she -- that's what she thought

3    would be the best thing at the time.  She didn't want to cause

4    any chaos.

5           To this day, she will take the blame for things that

6    are not her fault.  I tell her every day:  This is not your

7    fault.  You didn't do this.  He did.

8           All four of my daughters, including his two

9    biological daughters, had to go through physical examinations

10   to make sure that they weren't touched or penetrated in any

11   way.  At the time my youngest I believe was going to be -- she

12   would have been four at the time.  She had to have a full

13   physical examination because he decided to touch and rape my

14   oldest daughter.  These children will not forget about that.

15   They won't forget about it in 15 years.

16          All my daughters went through counseling after this

17   is.  Luckily, CPS lined me up with some of the most amazing

18   people and the people that had helped me.  A lot of people

19   have horrible things to say about CPS.  I have nothing but

20   great things to say.  They lined me up with a counselor for my

21   three youngest to go to weekly where they were just able to

22   play and talk and to try to find out if he did anything to any

23   of them.  According to what they were able to find out, he

24   didn't.  But sometimes I still think, well, he did it to one.

25   He has other victims.  He was seeking out other children.  He

1    has countless nieces and nephews.  Why wasn't -- why are they

2    any different than my daughter?  To me, they're all in danger.

3    Any child around him is in danger.

4            This is very minor, but this affected my job.  I

5    missed two weeks in the beginning of June to rebuild my house.

6    Luckily, I got paid because I had COVID leave.  For case prep,

7    I took three weeks off.  I'm not promotable at my job because

8    I don't have an open availability.  I take every Tuesday off

9    to take my daughter to her counselor, to her therapist, and I

10   will continue to do that as long as I can.  I don't care.

11   When she turns 18, she's still my daughter.  If she needs a

12   ride, I will get her there.  If she needs help paying for it,

13   I will pay for it.  I wasn't able to protect her the way I

14   should have as -- her as a child.  I was too blind, couldn't

15   see through the character that he was of being, oh, well, if

16   you're upset, I'll sing to you, things will be better.

17           Obviously ▇ was the most affected.  She was scared

18   to go anywhere after.  She felt everybody knew something, and

19   something was going to happen to her.  When the allegations

20   went out that he abused his daughter, they hit the newspaper.

21   They were so specific that people knew who I was, and they

22   knew what daughter it was.  And she didn't want to go to

23   school, and luckily it was COVID and she could do it online.

24           But her freshman year came, and luckily things had

25   died down enough.  This year, it's time.  It was time for the

1    case.  The only selfless thing that he ever did was say he was

2    guilty that day.  Because the last thing that I wanted was

3    another newspaper article where she felt like she wasn't

4    protected.

5           When the news -- she felt like everyone failed her

6    and that she was supposed to be protected.  She went into mom

7    mode.  She tried to protect her baby sisters.  She tried to do

8    everything for them; cook for them, clean for them, anything.

9    No matter what I tried to do for them, she wanted to do it

10   better because she felt like she needed to protect them.  And

11   that's how she was trying to protect herself.  She stopped

12   showering for a while because she thought nobody would want

13   her if she didn't shower.  She stopped eating.  But the worst

14   is she stopped smiling.  She felt that, if she kept it to

15   herself, we would have been better.  I remind her all the time

16   this isn't her fault and that it's his, that he did this to

17   her.  And I remind her every day that she saved herself and

18   she at least saved one other girl.  And then there's probably

19   countless others that he could have talked to, got to, and

20   maybe even raped.

21          She had to start take medication because she couldn't

22   feel any more.  But she is so strong, she recognized that

23   herself.  The day I told her her dog, Kraken, had died she

24   just continued eating like nothing had happened.  She knew she

25   felt dead inside.  She went to her psychologist and told her

1    that, and then that's when we decided to start medication so

2    she'd have the ability to feel again.

3           He took -- he took her ability away to feel happy.

4    She quit all of her hobbies.  She can be compulsive and do

5    things just because she wants to feel that rush and that

6    happiness because, what we can do for ourselves that we --

7    like, sit down and read to make us happy, she doesn't have

8    that anymore.  And that's why she continues to go to

9    counseling and will for the rest of her life.

10          She gets anxiety around people coming into our home

11   because that's where he started raping her, is in our home.

12   So if people come into our home, we talk to her and be like,

13   if you feel unsafe, that person leaves.  But that anxiety

14   still has not passed from her.

15          And one thing that wasn't addressed today is his

16   friend, Phil, abused my daughter.  And he had thrown Phil out

17   of our house.  He didn't tell me what happened and refused to

18   tell me what happened, and nobody would.  I figured out why he

19   didn't.  Because if she talked to somebody, he would have been

20   found out.  He protected another predator who's already been

21   sentenced for 39 years because he didn't want to be found out.

22          Everything he does for somebody is going to benefit

23   him, and it always has.  All of these selfless acts that they

24   spoke about was to keep his character good somewhere.  I

25   don't -- I believe he loves his family, but it was all to look

1   good.  Anything he ever did for me was just so I would stay

2   longer.

3           My daughter's memories are going to live forever.

4   They're not going to go away in 15 years.  If he ever had the

5   opportunity to get out, she would break down.  She would feel

6   like she failed of protecting herself and other people.  The

7   only thing I live for now is to make sure that my daughters

8   are protected.  And if I didn't stand here and talk to you and

9   tell you how I felt about what she had gone through, what I

10  had gone through, I don't know if everybody would really know

11  what kind of monster he was and he can be.

12          I never spoke ill to him to his family during this

13  whole thing because I care for them and I love them, and I

14  didn't want to bring them that pain.  But he is a monster.  He

15  [indiscernible] of my daughter, he went after these other

16  girls, he was doing it on the Internet, he was distributing

17  porn to other people who are just as awful as he is.

18          So I don't think 15 years is enough.  Thank you.

19          **THE COURT:**  Thank you.

20          **MS. PUCCI:**  Your Honor, is it okay if she were to

21  take the witness stand?  She would like to make sure she can

22  address the defendant.

23          **THE COURT:**  Sure.

24          **VICTIM 1:**  I was writing this last minute, but I did

25  have a lot on my mind.  One thing I wanted to ask was:  Why?

1    Why me?  Why did I deserve or receive to go through that?  I

2    mean, thank God it was me though; right?  I would have -- I

3    don't want anybody to go through what I went through.  I

4    constantly wondered if it was normal or okay, and I would just

5    sit and wonder why.  Like, at night, like, I would just --

6    just sit and listen to this one song and that just -- I would

7    just wonder:  Why -- why me?

8         During the whole thing, I was kind of emotionless

9    about it because I didn't know if it was normal or -- and I

10   didn't know if it was okay or not.  But I thought this was --

11   oh, this is what people do.  This is okay.  I never -- I

12   didn't know how to deal with my emotions, so I just kept them

13   hidden a lot.  But once things were able to get out, it was

14   when I was really affected.  I didn't know how to cope.  I --

15   my -- my mom is right.  I was afraid to talk to anybody.  I

16   felt like my family didn't -- didn't love me, didn't

17   appreciate me anymore and saw me as just wanting to get rid of

18   him because I didn't like him.

19        And that point, we did have good times together.  But

20   then I would still remember about what was happening, and

21   still wondering why.

22        When it first -- when the FBI came to our house, I

23   was -- that was the one thing I was scared of.  I was, like,

24   they're going to find out.  They're going to find out.  And I

25   didn't want them to find out, and that's why I tried to keep

1    it in during the investigation.  But as soon as I was showed

2    the pictures of me, that's when it, like, finally hit.  And

3    then that's when I had -- I had to say something.

4            After that, I was just emotionless.  I didn't -- I

5    didn't know how to feel, and it progressively got worse.  As

6    my mom said, I did stop showering, stop eating, and I also

7    tried to find other ways to cope, which included self-harm.

8    And I struggled with that for about a year.  I -- it -- this

9    affects my relationships with other people friend-wise and

10   just talking to other people wise.  It just affects just

11   all -- all my relationships with everybody.  But the fact that

12   I thought it was my fault is what still kind of hurts me now

13   because it wasn't my fault.  I mean, yes, I allowed it to

14   happen because what else -- I didn't know what else to do.

15           When I stepped in here and he looked at me, I was --

16   I didn't want to do this.  But then I knew I -- I knew I had

17   to finally close the -- this chapter.  Because it's been --

18   it's still going to bother me forever while you just get to

19   sit and just let it just -- you just get to remember what you

20   did while I just get to sit and struggle every single day with

21   my relationships, my mental health, and just everything.  I

22   still have scars that I have to look at every single day

23   because of what other people -- kind of what other people

24   caused, and mostly because of you because you took my

25   self-worth away.  You took it all away, and it's still

 1   something that I struggle with every single day talking to
 2   people.
 3           This whole -- leading up to it, watching the
 4   interviews again, it -- that's what really -- that's what
 5   really -- I'm trying not to swear -- that's what really hurt
 6   me.  Just rewatching just everything, just knowing the emotion
 7   that I went through was -- that was the toughest part.  But
 8   knowing that I would have to see you again and face you again
 9   is what also made me really afraid.  Because the last time I
10   saw you, you were sexually abusing me.
11           I -- I don't think you should just get 15 years
12   because I'm still going to be living my life, and I don't need
13   to be dealing with knowing that you're out, that you could be
14   possibly trying to hurt other people, and I don't want you
15   communicating with my sisters at all.  I don't want you
16   communicating with them at all.  You do not deserve to talk to
17   them at all.  And neither do you deserve to talk to my mom or
18   me or -- or my other sister, ████████, ever -- I don't want you
19   talking to any of them.
20           I have a lot more to say, and I really wish I could
21   stand right up next to you and just scream and yell at you
22   because of how much you've put me through.  I really, really
23   wish I could do that, but I can't.
24           That's all.
25           **THE COURT:**  Thank you.

1          **MS. PUCCI:**  Thank you, Your Honor.

2          **THE COURT:**  Thank you.

3          Anyone else, Ms. Pucci?

4          **MS. PUCCI:**  No, Your Honor.  Thank you.

5          **THE COURT:**  All right.  Does Probation have anything

6     to add?

7          **PROBATION OFFICER:**  I do not, Your Honor.

8          **THE COURT:**  Thank you.

9          All right.  Any reason, legal or just, why I should

10    not proceed with sentencing at this time?

11         **MR. DRASKOVICH:**  No, there is not.

12         **MS. PUCCI:**  No, Your Honor.

13         **THE COURT:**  I have heard and read and considered the

14    charging document, the information at the plea hearing, the

15    Presentence Investigation Report, the sentencing memoranda

16    filed by both sides and anything attached to that --

17         This will take me a little while, Mr. Draskovich.

18    You-all can have a seat.  Thank you.

19         -- the statements and arguments of counsel, the

20    statements by the defendant, the statements by everyone here

21    in the courtroom today, Mr. Parshall's family, the victim, and

22    her mother.  And, of course, all of the factors and

23    considerations under § 3553(a).

24         First, there are several points I think that are key

25    factors in the analysis of the correct sentence in this case.

1    I first consider the nature of Mr. Parshall's conduct.  He

2    pled guilty on the eve of trial to four separate sex crimes;

3    two counts of sexual exploitation of children, one count of

4    coercion and enticement, and one count of receipt and

5    distribution of child pornography.  These are all extremely

6    serious crimes, and they target our community's most

7    vulnerable members.

8         Indeed, the types of sex crimes that typically find

9    their way into this courtroom have various categories of

10   victims.  The first category is children whom the defendant

11   never meets.  These are the victims of much of the child

12   pornography that forms the basis of the § 2252 offenses that

13   we see.  And these offenses -- offenses are horrible because

14   they continue to revictimize their subjects by feeding a

15   depraved market and keeping these images alive.  All child

16   pornography offenses are extremely serious because they result

17   in perpetual harm to victims and validate and normalize the

18   sexual exploitation of children.

19        Congress has indicated its intent that crimes like

20   this receive strong and lengthy sentences, as you indicated,

21   Mr. Draskovich.  And these are the types of victims of Count 4

22   in this case.

23        The defendants who commit these crimes often argue

24   that the crimes are bad but they're not really dangerous to

25   the public because these crimes are committed from a computer

1  screen, and the risk of touching a real child is nonexistent

2  or low.

3        The second category is children who the defendant

4  seeks out and contacts over the Internet but not in person,

5  either -- typically, just because it didn't get to that point.

6  And these are actual children in actual communications with a

7  defendant often who becomes a victim by being enticed to send

8  photographs or engage in sexually explicit communications with

9  the defendant.  These children are personally victimized by

10  the defendants who engage in this behavior, predators, who

11  threaten their entire sense of safety.  Mr. Parshall was doing

12  this to Victim Number 2 and others.

13        Defendants who engage in this conduct often argue

14  that they were engaging in some kind of a depraved fantasy but

15  really wouldn't touch these children.

16        And then the third category is those children that

17  the defendant does touch.  Mr. Parshall was doing this to

18  Victim Number 1 for many of her young years; hideously and

19  habitually sexually abusing this child in his care and

20  custody.  As if that wasn't torture enough, he also took

21  photos and video of these vile and debased crimes and

22  published them to like-minded monsters in this incestuous

23  pedophile community and shared with them the stories of his

24  conquests.

25        Mr. Parshall, with all of his actions in the

1   aggregate, has demonstrated that no children are safe from him

2   and his crimes.  He is dangerous; a dangerous, long-term

3   habitual predator, and his prey of choice and young, often

4   very young, girls.

5         I've also listened carefully to Mr. Parshall's

6   sisters and parents and all that they had to say.  So, in

7   reaching a sentencing determination, I don't discount the

8   mitigating considerations that he served his country in the

9   Armed Forces, that he has a minimal criminal history, and this

10  is his first felony conviction and he has accepted

11  responsibility for his crimes by entering a guilty plea to

12  each of them before putting the victims on the stand.  He is

13  apologetic, and he clearly has strong family support.

14        The length of time that these crimes went on, even

15  after being confronted by the victim's mom about them,

16  indicates that Mr. Parshall's likelihood of recidivism is real

17  and serious.  And the only way to mitigate that is a

18  significant term of incarceration.  And certainly these are

19  the types of crimes that Congress has ensured that a lengthy

20  term of incarceration will be given for.

21        So when I consider all of these factors and certainly

22  all of the factors, as I must, under § 3553(a), I find that a

23  sentence of -- for Counts 1 and 2, the statutory maximum of 30

24  years.  For Count 3, 33 years.  For Count 4, the statutory

25  maximum of 20 years, concurrent, for a total of 33 years

1    followed by lifetime supervision concurrent to his state court

2    sex crime prosecution charges but consecutive to any sentence

3    he receives in the JTTF cases -- the federal cases,

4    2:20-cr-128, the state case is C-20-348860-2 -- is sufficient

5    but not greater than necessary to accomplish the goals and

6    objectives of sentencing.

7          I believe that this sentence takes into account the

8    nature and circumstances of the offenses, the history and

9    characteristics of the defendant, the kinds of sentences

10   available, the sentencing range, and the policy statements of

11   the Sentencing Commission.  I believe this sentence reflects

12   the seriousness of these crimes, promotes respect for the law,

13   provides just punishment, affords adequate deterrence to

14   criminal conduct, will help protect the public from further

15   crimes by Mr. Parshall, will provide Mr. Parshall with needed

16   programming, will avoid sentencing disparities, particularly

17   when I consider the various sentences that have been given in

18   similar cases, as reflected in the Government's sentencing

19   memo, and is consistent -- I'm sorry, and so the defendant is,

20   therefore, committed to the Bureau of Prisons for a term of 33

21   years.

22         I want to just make a note that, in determining the

23   sentencing guideline calculations, I did find that all of the

24   enhancements and offense characteristics in the guideline

25   calculations are supported by a preponderance of the evidence

1    based on the defendant's factual admissions at the plea

2    hearing and also based on the information contained in the

3    PSR.

4            So I'm going to turn now to the supervised release

5    conditions.

6            Mr. Draskovich, in the PSR Probation recommends a

7    number of supervised release conditions.  Are there any

8    objections?

9            **MR. DRASKOVICH:**  No, there is not.

10           **THE COURT:**  So while on supervised release, the

11   defendant will be required to comply with the standard

12   conditions of supervision recommended by the Sentencing

13   Commission.  The mandatory conditions of not committing

14   another crime, not unlawfully possessing a controlled

15   substance, refraining from unlawful use of a controlled

16   substance, and participating in the drug testing protocol,

17   making restitution, cooperating in the collection of DNA as

18   directed by the probation officer, and then complying with the

19   requirements of the Sex Offender Registration and Notification

20   Act -- we know that as SORNA -- as directed by the probation

21   officer, the Bureau of Prisons, or any state sex offender

22   registration agency in the state in which you reside, work,

23   are a student, or were convicted of a qualifying offense.

24           The special conditions of employment with the U.S.

25   Probation Office approval, the minor prohibition -- this is

1    the one that prevents you from having direct contact with any

2    child you know or reasonably should know to be under the age

3    of 18, including your own children, without the permission of

4    the probation officer.  If you do have direct contact with a

5    child you know or reasonably should know to be under the age

6    of 18, including your own children, without the permission of

7    Probation, you must report the contact within 24 hours.

8    Direct contact includes written communication, in-person

9    communication, or physical contact.  Direct contact does not

10   include incidental contact during ordinary daily activities in

11   public places.

12           I note that this is one of those conditions that

13   targets a defendant's right to associate with an intimate

14   family member.  I've undertaken an individualized review of

15   the relationship between the defendant and his children and

16   concluded that this restriction is necessary to accomplish the

17   goals of deterrence, protection of the public, rehabilitation,

18   and this is based on the communications that this defendant

19   was habitually engaging in with his own daughter -- or his own

20   stepdaughter and his other victims, and the level of -- and

21   the fact that the evidence in this case indicates that the

22   level of access and grooming all happened because of that

23   intimate relationship.

24           For the same reason, you must not communicate or

25   otherwise interact with Victim Number 1 or Victim Number 2

 1   either directly or through someone else without first

 2   obtaining the permission of the Probation Office; that you

 3   will have the place restriction.  So you will not be permitted

 4   to go or remain at any place primarily used by children under

 5   the age of 18 without the express permission of Probation.

 6   The search and seizure condition will apply, the

 7   no-pornography condition will apply, the sex offender

 8   treatment condition, and the polygraph condition, the computer

 9   search, computer monitoring, and computer monitoring software

10   conditions will all be imposed.

11          And I find that all of these conditions are

12   reasonably related to the goals of deterrence, protection of

13   the public, or rehabilitation; that they involve no greater

14   deprivation of liberty than reasonably necessary to achieve

15   these goals, and that they are consistent with the pertinent

16   policy statements issued by the Sentencing Commission.

17          Do we have a copy of those conditions in writing for

18   the defendant?

19          **PROBATION OFFICER:**  Yes, Your Honor.

20          **THE COURT:**  Mr. Parshall, you're being handed a

21   written copy of those supervised release conditions.  Can you

22   acknowledge that for the record, please?

23          **THE DEFENDANT:**  Yes, I have them.  Thank you.

24          **THE COURT:**  Thank you.

25          A mandatory penalty assessment of $400, which is $100

1    per count, is required by statute.  It's hereby imposed, and

2    it is due immediately.  No fine will be imposed based on a

3    demonstrated inability to pay.

4           Let's talk about restitution, Ms. Pucci.

5           **MS. PUCCI:**  Yes, Your Honor.  There was a sealed

6    restitution request in the amount of $31,920 for Victim 1.  We

7    would ask that that be imposed as it is mandatory pursuant to

8    the statutes in this case.

9           **THE COURT:**  Any objection, Mr. Draskovich?

10          **MR. DRASKOVICH:**  We will submit it, Your Honor.

11          **THE COURT:**  Thank you.

12          I have reviewed that request, and I am going to award

13   restitution to Victim 1 in the amount of $31,920 based on the

14   information that was provided in that sealed document.

15          And that is imposed under Title 18 United States Code

16   § 3663A.  Is that correct, Ms. Pucci?

17          **MS. PUCCI:**  Yes, Your Honor.  Thank you.

18          **THE COURT:**  Are there additional findings that I need

19   to make?

20          **MS. PUCCI:**  Your Honor, with regards to forfeiture,

21   there is a Final Order of Forfeiture on the docket at 72.  I

22   have a copy if Your Honor does need it.

23          **THE COURT:**  I have that one.

24          Mr. Draskovich, have you had an opportunity to review

25   the Final Order of Forfeiture?

1          **MR. DRASKOVICH:**  I have, Your Honor, and we have no

2     objection.

3          **THE COURT:**  All right.  It's the Samsung A6 cellular

4     phone and the Samsung Galaxy cellular phones.  And I'm going

5     to sign this proposed order and hand it to Danielle for

6     filing.  Thank you.

7          Anything else on that, Mr. Draskovich?

8          **MR. DRASKOVICH:**  No, Your Honor.  Thank you.

9          **THE COURT:**  Okay.  Let's turn back to restitution.

10    So I do -- with respect to that prior amount, I do order the

11    defendant to make restitution in the amount of $31,920.  This

12    is an offense for which restitution is authorized by statute,

13    and this is an amount that is consistent with and I find is

14    the amount of actual loss sustained by the victim -- Victim

15    Number 1 -- as a result of this offense or will be the amount

16    she sustains.

17         Any unpaid balance must be paid at a monthly rate of

18    not less than 10 percent of any income earned during

19    incarceration or gross income while on supervision subject to

20    adjustment based on ability to pay.  I do not order interest

21    to accrue on the restitution judgment.

22         **MS. PUCCI:**  Your Honor?

23         **THE COURT:**  Other restitution items?

24         **MS. PUCCI:**  There's no other restitution that we're

25    seeking in this case.  The other victims did withdraw knowing

1    that there was a live victim, but I did want to clarify and

2    correct myself.  Because this was a 2251 case, the restitution

3    is mandatory under 2259(b)(9) and (c)(3).

4            **THE COURT:**  Sorry.  So then it will be under

5    2259(b)(9) and (c)(3)?

6            **MS. PUCCI:**  Correct.

7            **THE COURT:**  All right.  Those will be the provisions

8    under which this is imposed.

9            **MS. PUCCI:**  Thank you, Your Honor.

10           **THE COURT:**  Is the Government asking for --

11           **MS. PUCCI:**  The last thing, Your Honor, I believe is

12   the JVTA assessment for Count 1 and Count 4.

13           **THE COURT:**  The Justice for Victims of Trafficking

14   Act of 2015 requires the Court to assess an amount of $5,000

15   per count on any non-indigent person or entity convicted of a

16   qualifying offense.  So the Government is asking for an award

17   then of $10,000 total on that?

18           **MS. PUCCI:**  Yes, Your Honor.

19           **THE COURT:**  Mr. Draskovich?

20           **MR. DRASKOVICH:**  Your Honor, it's our position that

21   he is an indigent person.

22           **THE COURT:**  Ms. Pucci, your response to the claim of

23   indigency?

24           **MS. PUCCI:**  Your Honor, he's not indigent.  He is a

25   capable person who, once he is out of custody, he can find a

1    job.  Also, the defendant has retained counsel in this case.

2    He was not found indigent in the case to retain

3    Mr. Draskovich, so we would ask that the $10,000 be imposed.

4           **MR. DRASKOVICH:**  And just briefly in response, given

5    the function of the last three years of his having been in

6    custody, his status has changed.

7           **THE COURT:**  All right.  Because I am not convinced

8    that he would not be capable of working and earning a living

9    once he is released, I do not find that he is indigent.  So I

10   am going to impose the $5,000-per-count assessment under the

11   JVTA for a total of $10,000.

12          Have I hit all of the fines and other provisions?

13          **MS. PUCCI:**  Yes, Your Honor.  The only last thing is

14   the right to appeal, and then we're done.  Thank you.

15          **THE COURT:**  Thank you.

16          Mr. Parshall, in your -- your -- to the extent that

17   you've retained rights to appeal, I'm advising you that you

18   have 14 days to file a notice of appeal.  If you cannot afford

19   an attorney to handle your appeal, one will be appointed to

20   represent you.  And if you cannot afford a transcript of the

21   record in this case, one will be prepared for appeal at the

22   Government's expense.

23          Do you understand all of that, sir?

24          **THE DEFENDANT:**  Yes, Your Honor.

25          **THE COURT:**  All right.  Thank you.

1    **PROBATION OFFICER:**  Your Honor?  I apologize for

2    interrupting.  I do believe that the Amy, Vicky, and Andy

3    Child Pornography Victim Assistance Act of 2018 applies in

4    this case.

5          **MS. PUCCI:**  May I have a moment, Your Honor?

6          **THE COURT:**  You may.

7          **MS. PUCCI:**  Your Honor, I do believe that Probation

8    is correct.  I think the minimum fine is $1,000, and I think

9    that is what was requested in the PSR if I'm not mistaken.

10         **THE COURT:**  That is what is indicated in the PSR.

11         **PROBATION OFFICER:**  Probation is recommending a

12   thousand.  Pursuant to the statute, the Court can go up to

13   $35,000.

14         **THE COURT:**  All right.  Mr. Draskovich, do you --

15   your response.

16         **MR. DRASKOVICH:**  Your Honor, we'll submit it on the

17   recommendation of Probation.

18         **THE COURT:**  Thank you.

19         All right.  And based on the recommendation by

20   Probation, I will impose the $1,000 assessment under the Amy,

21   Vicky, and Andy Child Pornography Victim Assistance of -- Act

22   of 2018 having considered the factors in Title 18 United

23   States Code § 3553(a) and in Title 18 United States Code

24   § 3572.

25         Mr. Parshall pled straight up to all of the charges,

1   so there's nothing to dismiss.

2           Mr. Draskovich, does your client request a

3   recommendation that he be permitted to serve his sentence at a

4   specific facility or one with a particular program?

5           **MR. DRASKOVICH:**  He just requests a facility in

6   California or a neighboring state, Your Honor.

7           **THE COURT:**  Okay.  Would that be based on proximity

8   to family?

9           **MR. DRASKOVICH:**  It will be.

10          **THE COURT:**  Okay.  That will be the recommendation

11  then, that he be designated to serve his sentence at a

12  facility in California based on proximity to family.

13          Is there anything else that I need to address?  I'll

14  ask Probation first.

15          **PROBATION OFFICER:**  No, Your Honor.

16          **THE COURT:**  Thank you.

17          **MR. DRASKOVICH:**  No, Your Honor.  Thank you.

18          **MS. PUCCI:**  No, Your Honor.  Thank you.

19          **THE COURT:**  All right.  Thank you.

20          All right.  Mr. Parshall, you wish you the best of

21  luck.

22          **THE DEFENDANT:**  Thank you.

23          **THE COURT:**  Defendant is remanded to the custody of

24  the Marshal to await designation by the Bureau of Prisons.

25  Thank you, all, for being here, and giving me your statements

```
 1    today.  We're adjourned.

 2         (Proceedings adjourned at 5:01 p.m.)

 3                         --o0o--

 4                 COURT REPORTER'S CERTIFICATE

 5

 6       I, AMBER M. McCLANE, Official Court Reporter, United

 7    States District Court, District of Nevada, Las Vegas, Nevada,

 8    do hereby certify that pursuant to 28 U.S.C. § 753 the

 9    foregoing is a true, complete, and correct transcript of the

10    proceedings had in connection with the above-entitled matter.

11

12    DATED:  7/23/2023

13

14                         /s/_____

15                         AMBER McCLANE, RPR, CRR, CCR #914

16

17

18

19

20

21

22

23

24

25
```